IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ROBERT J. DUNKIN, | ) | 4:12CV3086 |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| ROBERT HOUSTON, Nebraska | ) | |
| Department of Correctional Services, | ) | |
| | ) | |
| Respondent. | ) | |

This matter is before the court on Petitioner Robert J. Dunkin's ("Petitioner" or "Dunkin") Petition for Writ of Habeas Corpus ("Petition"). (Filing No. 1.) For the reasons set forth below, Dunkin's Petition is dismissed with prejudice.

## I.  BACKGROUND

### A.  Conviction

Dunkin was charged by information with murder in the first degree and use of a weapon to commit a felony in the Lancaster County District Court ("state district court") in connection with the death of his girlfriend.  On February 10, 2009, the State of Nebraska ("state") amended the information to charge Dunkin with murder in the second degree and, in exchange, Dunkin pled no-contest to the amended information. (Filing No. 8-1 at CM/ECF pp. 72-74.)  Thereafter, the court sentenced Dunkin to  40 years' to life imprisonment.  (*Id.* at 93.)  Dunkin did not appeal the court's conviction and sentence.

### B.  Post-Conviction Motion and Appeal

Dunkin filed a motion for post-conviction relief ("post-conviction motion") in the state district court on February 23, 2010. (Filing No. 8-5 at CM/ECF p. 30.)  After

holding an evidentiary hearing on Dunkin's post-conviction motion, the state district court denied post-conviction relief on February 23, 2011.  (*Id.* at CM/ECF pp. 106-119.)  Dunkin timely appealed the state court's decision.  The appeal was taken up by the Nebraska Supreme Court, which denied relief by written opinion in *State v. Dunkin*, 807 N.W.2d 744 (Neb. 2012).  In its written opinion, the Nebraska Supreme Court summarized the relevant factual and procedural history:

### 2. Evidentiary Hearing on Postconviction Motion

Dunkin testified at the hearing on his postconviction motion. Dunkin stated that he was initially represented by an attorney from the Commission on Public Advocacy, but that Dunkin's brother wanted to hire a private attorney. Dunkin's brother hired trial counsel to represent him, and Dunkin's brother signed a fee agreement and paid a flat fee of $25,000. Dunkin stated that throughout the proceedings, his mother and brother were in contact with counsel while Dunkin was in jail, to relay messages from Dunkin. Dunkin stated that he could not contact counsel directly because counsel's office did not accept collect telephone calls. Counsel testified, however, that his office policy was to accept collect calls from clients who are in jail.

Dunkin testified regarding his first meeting with counsel on August 1, 2008, during which meeting Dunkin told counsel his version of the events that occurred on January 21 and 22, 2008, which had led to the death of Anderson. Dunkin explained that he had been in a relationship with Anderson for approximately 6 months. The evening of her death, she had gone to Dunkin's house and began crying. The two had previously discussed whether Anderson had cheated on Dunkin, and he again asked her if that was the case. Anderson did not answer, and Dunkin repeatedly asked if she had cheated on him until Anderson got angry. Anderson then jumped out of her chair and swung her purse at Dunkin, which hit him in the head and knocked him to the ground. Anderson swung her arms at Dunkin, and he attempted to restrain her but she bit him on the arm, knocking him to the ground again.

2

Dunkin testified that Anderson told him she was going to kill him and then reached for a chair where he kept a gun. At the same time, Dunkin moved to reach the gun first; a struggle ensued, during which Anderson kicked Dunkin in the knee and he fell into the wall. When Dunkin fell, the gun went off and struck and killed Anderson. Dunkin testified that he told counsel that Anderson's death was accidental and unintentional. Dunkin stated that counsel told him that he thought Dunkin had a good case for manslaughter.

Dunkin explained to counsel that he had taken a large amount of prescription pills after the incident, including more than 60 Xanax pills, some Percocet, hydrocodone, and "Ambien CR." Dunkin stated that he remembers nothing between the time he took the pills and when he woke up in jail. Dunkin testified that counsel commented he thought that that number of pills would have killed Dunkin and that Dunkin stated he had taken the pills because he wanted to kill himself because he could not live with what had happened.

(a) Suppression Hearing

Following the incident, Dunkin was taken from his home to a hospital by ambulance because of the possible overdose. Dunkin made statements to medical personnel and police officers during the ambulance ride and after arriving at the hospital. The statements made by Dunkin during this time were recorded by a police officer who rode to the hospital in the ambulance with Dunkin.

Counsel filed a motion to suppress the statements Dunkin had made to law enforcement and medical personnel when he was taken into custody. In the motion to suppress, counsel argued that Dunkin's statements to medical personnel should be suppressed on the basis of doctor-patient privilege. He also claimed that the statements Dunkin made to police officers at the hospital should be suppressed, because Dunkin was not properly advised of his Miranda rights. A suppression hearing was scheduled, and on December 23, 2008, Dunkin met with counsel for the second time for approximately 10 minutes immediately prior to the hearing to discuss what would happen.

At the suppression hearing, the State called two police officers to testify; counsel did not call any witnesses on Dunkin's behalf, nor did Dunkin testify. Dunkin met with counsel briefly following the suppression hearing, and counsel explained that the hearing had gone as he expected it would. Dunkin testified that he was lucid during the hearing and understood what was going on.

After taking the motion to suppress under advisement, the court overruled the motion in regard to Dunkin's statements made during transport to the hospital and those made to police officers at the hospital after Dunkin was read his Miranda rights, and it sustained the motion in regard to statements he made to police prior to being advised of his Miranda rights. The court reserved ruling on statements made by Dunkin to the treating physician at the hospital. Dunkin said that he wanted to appeal the suppression order but that counsel told him that could not be done because it was not a final, appealable order. Dunkin then told counsel he should try to negotiate a manslaughter charge.

(b) Autopsy Report

Dunkin testified that he told counsel that the autopsy report was incorrect, because it reported that Anderson had died of strangulation and a gunshot wound. Dunkin told counsel that Anderson must have had bruises on her neck and that if this could be confirmed, it would support Dunkin's version of the events—that the death was accidental.

Counsel obtained court approval for appointment of an expert witness. Counsel retained Dr. George Nichols, with whom he had worked in a previous case. Counsel believed Nichols to be highly qualified and retained Nichols to review the autopsy report. Nichols was supplied with the police and medical reports related to Dunkin's case. Counsel testified that Nichols reviewed all of the documents in the case and was unable to confirm Dunkin's version of the events. Counsel stated that Nichols' opinion was generally unfavorable to Dunkin and that he did not receive a written report of Nichols' findings.

4

Nichols reviewed the bruises on Anderson's neck, with which Dunkin took issue, and determined that the bruises on her neck were not from strangulation or a purse strap as Dunkin had stated, but appeared to be from a "karate chop"-like blow to the neck. After reviewing the documents, Nichols informed counsel that he thought Dunkin's version of the incident was implausible and that it appeared that Anderson's death "was an execution."

(c) Plea Negotiations and Proceeding

On February 10, 2009, counsel presented Dunkin with a plea offer of second degree murder and a dismissal of the gun charge. Dunkin asked counsel, If "this were your kid" in this situation, "what would you tell them [sic] to do?" Counsel said that he would advise him to take the plea deal, because the State would dismiss the gun charge and he would probably be looking at 20 to 30 years' imprisonment, which would be "really close" to what a manslaughter conviction would get him. Dunkin testified that counsel told him that the judge wanted his plea by the end of the day if he were going to take the deal. Dunkin stated that he felt "pressured" and "rushed" during the meeting regarding the plea offer.

Dunkin met with counsel for a second time also on February 10, 2009, for 10 to 15 minutes. Dunkin testified that at that point, Dunkin felt that they were not ready for trial, which was scheduled for 1 week later. Dunkin stated that they had not discussed strategy and that he had not been prepped to testify, so he decided to take the plea offer. Dunkin testified that counsel told him he had spoken with the prosecutor, the judge, and the parole board and that Dunkin would be let out of prison on his first parole date.

Counsel stated that he did not depose any witnesses because he was able to rely on witness interviews conducted by Dunkin's previous attorney from the Commission on Public Advocacy. Counsel also testified that he felt he was prepared for trial and that he advised Dunkin to take the plea offer, because he felt there was a substantial likelihood Dunkin would be convicted of first degree murder if the case went to trial.

5

Dunkin entered his plea of no contest to the charge of murder in the second degree on February 10, 2009. At the plea hearing, Dunkin stated that he was taking several medications and that the medications helped him to think more clearly. During postconviction proceedings, however, Dunkin stated that he was suffering from anxiety on February 10 and that as a result, his mind was "racing" and he could not think straight. Dunkin testified that he did not freely and voluntarily plead no contest, because he was heavily medicated, he was not "in the right mind" to make such a decision, and he felt pressured. Dunkin stated that he decided to take the plea, because he had not discussed trial strategy with counsel and he felt rushed.

Dunkin also testified that counsel told him what answers to give to the judge at the plea hearing. Dunkin stated that without that preparation, he would not have been able to properly answer the questions regarding his understanding of the plea. Counsel testified that he did not pressure Dunkin in any way to accept a plea offer; that at all times, he told Dunkin to answer questions from the court truthfully; and that he told Dunkin he hoped for a sentence of 20 to 30 years' imprisonment, but had made no promises.

Sentencing was scheduled for April 27, 2009. Dunkin did not meet or speak with counsel prior to the sentencing date. On the day of the sentencing hearing, Dunkin and counsel met briefly. Dunkin had prepared a statement for the hearing that he wanted to read so Anderson's family could hear what had happened. Counsel told Dunkin it would be in his best interests not to say anything, and Dunkin refrained from reading his statement and said only that he was sorry and took responsibility for what had happened. The court imposed a sentence of 40 years' to life imprisonment.

(d) Possibility of Appeal

Dunkin had no further contact with counsel following sentencing, nor did they discuss an appeal. Dunkin did not speak with counsel directly regarding an appeal of his conviction or sentence. However, Dunkin testified that he asked his mother, brother, and son to tell

6

counsel that he wanted to appeal. Dunkin stated that he did not receive any correspondence from counsel regarding his ability to appeal and that he never signed a waiver of appeal.

Dunkin's mother, Meredith Chisholm, testified that Dunkin called her on May 8, 2009, and asked her if she would contact counsel to request an appeal. Chisholm contacted counsel on May 12 and left a message. Counsel returned Chisholm's call 2 days later, when Chisholm asked about the chances Dunkin would have on appeal and asked that counsel visit Dunkin in jail. Counsel stated that he believed the chances of success on appeal were slim and that he could not "take any more money from [the family]." Counsel did not speak with Chisholm any further regarding the possibility of an appeal.

Counsel testified that he did not get a written waiver of appeal from Dunkin or advise Dunkin or Chisholm that it would be possible to obtain court-appointed counsel to prosecute an appeal if Dunkin was determined to be indigent. However, counsel stated that he discussed the possibility of a successful appeal with Chisholm within 30 days of Dunkin's sentencing. At that time, Chisholm did not request that he file an appeal. Counsel further testified that he had explained to Dunkin that he would not be able to appeal the suppression order if he accepted the plea offer. And counsel testified that he also discussed all the other rights that Dunkin would waive if he entered the plea.

(e) Disposition

Following the evidentiary hearing, the district court denied Dunkin's request for postconviction relief. The court determined that Dunkin's plea was made freely and knowingly, without pressure or coercion from counsel and without the promise of a specific sentence. The court also found that counsel was not ineffective in his preparation for trial or in failing to request a competency examination. Finally, the court determined that although counsel engaged in some discussion regarding the possibility of an appeal, counsel was not ineffective in failing to file an appeal, because the record reflects that no request for appeal was made.

7

*Id.* at 748-753.

## C.    Petition

Dunkin timely filed his Petition in this court on May 1, 2012. (Filing No. 1.) In response to Dunkin's Petition, Respondent filed an Answer, a Brief, and the relevant State Court Records. (Filing Nos. 8, 9, 10.) Dunkin submitted a Brief in support of his Petition. (Filing No. 15.) The court deems this matter fully submitted.

## II.  DISCUSSION OF DUNKIN'S CLAIMS

Liberally construing the allegations of Dunkin's Petition, Dunkin argues he is entitled to a writ of habeas corpus because he was denied the effective assistance of trial counsel in violation of the Sixth Amendment. Dunkin argues that trial counsel was ineffective because he promised Dunkin a specific sentence, which Dunkin did not receive; he failed to prepare for trial by interviewing necessary witnesses and developing evidence that Dunkin did not intend to kill the victim; he failed to appeal the state district court's denial of the motion to suppress; and he failed to appeal Dunkin's conviction and sentence. The Nebraska state courts adjudicated each of these claims on the merits and so the court's analysis is governed by the provisions set forth in 28 U.S.C. § 2254(d).

## A.    Standard Under 28 U.S.C. § 2254(d)

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts. *See* 28 U.S.C. § 2254(d). Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as

8

determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  As explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. 529 U.S. at 405-406.  Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, Section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).  The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*  In short, "[i]t bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*  However, this high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can

9

apply the deferential AEDPA standard to [the petitioner's] claim.  The claim must have been 'adjudicated on the merits' in state court.").

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

> AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. . . . Accordingly, the postconviction trial court's discussion of counsel's performance–combined with its express determination that the ineffective-assistance claim as a whole lacked merit–plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (internal quotation marks and citations omitted).  The court also determined that a federal court reviewing a habeas claim under AEDPA must "look through" the state court opinions and "apply AEDPA review to the 'last reasoned decision' of the state courts."  *Id.* at 497.  A district court should do "so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims."  *Id.*  The Supreme Court agrees, stating:

> There is no text in the statute requiring a statement of reasons.  The statute refers only to a "decision," which resulted from an "adjudication."  As every Court of Appeals to consider the issue has recognized, determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.

*Harrington*, 131 S. Ct. at 784.

10

Here, because Dunkin argues his counsel was ineffective, the court must address Dunkin's arguments under the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984).

## B.   *Strickland* Standard

*Strickland* requires that the petitioner demonstrate both that his counsel's performance was deficient, and that such deficient performance prejudiced the petitioner's defense. *Id.* at 687. The first prong of the *Strickland* test requires that the petitioner demonstrate that his attorney failed to provide reasonably effective assistance. *Id.* at 687-88. In conducting such a review, the courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The second prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A court need not address the reasonableness of the attorney's skills and diligence if the movant cannot prove prejudice under the second prong of this test. *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996). Further, as set forth in *Strickland*, counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in a later habeas corpus action. *Strickland*, 466 U.S. at 690.

Additionally, the Supreme Court has emphasized that the deference due the state courts applies with vigor to decisions involving ineffective assistance of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111 (2009). In *Knowles*, the Justices stressed that under the *Strickland* standard, the state courts have a great deal of "latitude" and "leeway," which presents a "substantially higher threshold" for a federal habeas petitioner to overcome. As stated in *Knowles*:

11

The question is not whether a federal court believes the state court's determination under the *Strickland* standard as incorrect but whether that determination was unreasonable–a substantially higher threshold. . . . And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Id.* at 123 (internal quotation marks and citations omitted).

## C.    No-Contest Plea

The majority of Dunkin's claims relate to his entry of the no-contest plea. Dunkin argues that he entered into a plea agreement with the state because trial counsel promised him a minimum sentence of 20 to 30 years' imprisonment, and because he knew trial counsel was not prepared for trial. The state district court and the Nebraska Supreme Court adjudicated and rejected these arguments on their merits, and did so under the two-prong *Strickland* standard.

### 1.    Specific Sentence

With respect to Dunkin's argument that he was promised a specific sentence, the Nebraska Supreme Court wrote, in relevant part:

Dunkin claims that counsel was ineffective in failing to object to the State's alleged breach of the plea agreement when he was sentenced to 40 years' to life imprisonment rather than 20 to 30 years' imprisonment. The district court determined that Dunkin's allegation that a specific sentence was promised or that the plea agreement was conditioned on such a sentence was without merit. The district court discussed sentencing with Dunkin at the plea hearing:

THE COURT: I assume there has been a plea agreement here, is that correct?

12

[Counsel for the State:] There has, Judge. The plea agreement is in exchange for the State filing the amended charge of second degree murder, ... Dunkin would plead guilty or no contest to that charge. No other charges stemming from the events of January 21, 2008, would be filed against ... Dunkin.

THE COURT: [Defense counsel], is that your understanding of the plea agreement?

[Defense counsel]: That's accurate, Your Honor.

THE COURT: And ... is that your understanding of the plea agreement?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And is this an agreeable way to dispose of the matter as far as you are concerned?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Other than this agreement, has anyone connected with law enforcement or anyone else made any threats, direct or indirect, used any force or held out any promises of any kind to get you to come in here today and to enter this plea and to waive your rights?

THE DEFENDANT: No, Your Honor.

THE COURT: Has anyone made any promises or representations to you as to what the actual sentence in this case might be should you enter this plea?

THE DEFENDANT: No, Your Honor.

THE COURT: Do you understand that within the limits of the statute the determination of the appropriate sentence is entirely up to the Court?

13

THE DEFENDANT: Yes, Your Honor.

THE COURT: And do you still wish to plead no contest to the charge in the Amended Information?

THE DEFENDANT: Yes, I do, Your Honor.

THE COURT: Again, are you freely and voluntarily entering this plea and waiving your rights?

THE DEFENDANT: Yes, Your Honor.

There is no evidence that Dunkin was promised a certain sentence, and other than his testimony at the evidentiary hearing below, there is no evidence that Dunkin believed he was guaranteed a sentence of 20 to 30 years' imprisonment. The record reflects that counsel told Dunkin he hoped for such a sentence, but this does not support an ineffectiveness claim. Dunkin's arguments to the contrary are without merit.

*Dunkin*, 807 N.W.2d at 754-55.

The Nebraska Supreme Court's findings of fact and conclusions of law are entitled to deference. The Nebraska Supreme Court's finding that Dunkin was not promised a specific sentence was not based on an unreasonable determination of the facts in light of the evidence. Indeed, the record is clear that the sentence Dunkin received–40 years to life–was within the range of possible penalties explained to him by the court at his plea hearing. (*See* Filing No. 8-1 at CM/ECF p. 74.) This claim has no merit, and a grant of a writ of habeas corpus is not warranted on this issue.

## 2. Trial Preparation

With respect to Dunkin's argument that counsel was not prepared for trial, the Nebraska Supreme Court wrote:

14

Dunkin claims he accepted the plea agreement only because he recognized that his counsel was not ready for trial. The district court concluded that Dunkin's arguments were without merit, because the record did not reflect that counsel pressured Dunkin to plead no contest and Dunkin failed to present any evidence of prejudice resulting from counsel's allegedly deficient pretrial investigation.

The record affirmatively reflects that Dunkin freely and voluntarily entered his plea. During the plea proceeding, the following colloquy occurred:

THE COURT: Have you discussed the plea proceedings that we are conducting here today with [counsel]?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Did he explain the Amended Information and the charge to you together with the rights we have been discussing?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And did [counsel] discuss with you all of the possible defenses to this charge that you might have if you were to have a trial?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Are there any defenses that you feel you may have or any facts about the case that you feel might be helpful to your defense that you have not discussed with [counsel]?

THE DEFENDANT: No, Your Honor.

THE COURT: In other words, have you told him everything about the case that you feel he needs to know to be able to represent you properly?

15

THE DEFENDANT: Yes, Your Honor.

THE COURT: Are you satisfied with the job he's done as your attorney?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you feel he is a competent lawyer, that he knows what he's doing?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Is there anything you have asked [counsel] to do in regard to representing you in this matter that he has failed to do?

THE DEFENDANT: No, Your Honor.

THE COURT: And have you had enough time to talk with him about the case?

THE DEFENDANT: Yes, Your Honor.

We agree with the district court that the record does not indicate that Dunkin was in any way uncertain or reluctant to enter his plea.

Based upon our review of the record, the district court's finding that Dunkin was not pressured or coerced is not clearly erroneous. Accordingly, we conclude that the court did not err in denying Dunkin's claim for postconviction relief.

*Dunkin*, 807 N.W.2d at 754-55.

The Nebraska state courts also discussed the adequacy of trial counsel's pretrial investigation.  The state district court wrote:

16

Dunkin claims that [counsel] failed to conduct an adequate pretrial investigation. However, there was no evidence of how this prejudiced Dunkin. The issue here was not that the victim was not killed by Dunkin but the degree of culpability. The only witnesses to the killing were Dunkin and the victim. [Counsel] did obtain the services of a forensic pathologist who [counsel] believed to be highly qualified in order to review the crime scene reports and photographs as well as the autopsy findings of Dr. Matthias Okoye. After reviewing these documents he informed [counsel] that Dunkin's version of the incident was implausible (actually, he said it "was full of sh __"), that the victim appeared to have been "executed" and that the mark on her neck was not from strangulation or her purse strap but appeared to be from a Karate like blow. Obviously, [counsel] concluded that testimony by Dr. Nichols would not be helpful and basically contradicted Dunkin's version of the incident.

(Filing No. 8-5 at CM/ECF p. 114.)  The Nebraska Supreme Court agreed, adding:

Finally, Dunkin asserts that he accepted the plea because counsel did not follow his instructions to interview witnesses and investigate the case. Dunkin requested that counsel interview Dunkin's sons, various experts, and character witnesses and argues that counsel should have subpoenaed such witnesses to testify at trial. Again, Dunkin claims that if counsel had interviewed or subpoenaed these witnesses, Dunkin would have insisted on going to trial. But Dunkin presented no evidence that any of these witnesses could have presented testimony both relevant to the case and favorable to Dunkin. The district court noted that Dunkin's sons had already been subpoenaed by the State and that counsel contacted a forensic pathologist, Nichols, per Dunkin's request. The court concluded, however, that the expert testimony would not be helpful to Dunkin, as it contradicted Dunkin's version of the incident. We agree with the district court that there is no evidence that Dunkin was prejudiced by counsel's failure to call these witnesses. Nor did counsel's decision not to call these witnesses unduly pressure or coerce Dunkin to accept a plea.

17

> Dunkin has failed to establish that counsel's preparation for the case was unreasonable or inadequate. And Dunkin has not established prejudice: The record does not indicate a reasonable probability that, but for counsel's alleged errors, Dunkin would not have entered his plea and would have insisted on going to trial. Dunkin's claim regarding inadequate preparation is therefore without merit.

*Dunkin*, 807 N.W.2d at 755.

These foregoing findings of fact and conclusions of law by the state district court and the Nebraska Supreme Court are entitled to deference under the statutory standard of review that applies to factual and legal conclusions reached by the state courts. The state courts' decisions on these issues do not conflict with Supreme Court precedents and were not based on an unreasonable determination of the facts in light of the evidence. Moreover, the state courts' decisions were reasonable and, after careful review of the record, the court agrees with them. The record reflects that Dunkin entered his plea to avoid facing a possible conviction for first degree murder, not because trial counsel was unprepared. This is clear given that both Dunkin and trial counsel were aware that even the forensic pathologist hired by the defense opined that the victim had been "executed" and not killed "accidentally" as argued by Dunkin. Accordingly, a grant of a writ of habeas corpus is not warranted on this issue.

**D.     Failure to Appeal Order on Motion to Suppress**

Dunkin argues that trial counsel failed to appeal the state district court's denial of Dunkin's motion to suppress. (Filing No. 1 at CM/ECF p. 10.) Dunkin's argument wholly lacks merit. As found by both the state district court and the Nebraska Supreme Court, an order overruling a motion to suppress statements is not a final appealable order in Nebraska. *Dunkin*, 807 N.W.2d at 755. Therefore,

Dunkin's trial counsel was not deficient in failing to appeal the state district court's denial of Dunkin's motion to suppress.

## E.      Direct Appeal

Dunkin argues that trial counsel was ineffective for failing to pursue a direct appeal on Dunkin's behalf. (Filing No. 1 at CM/ECF pp. 6-7.) Both the state district court and the Nebraska Supreme Court adjudicated and rejected this argument on the merits, and did so under the two-prong *Strickland* standard. (*See* state district court opinion at Filing No. 8-5 at CM/ECF pp. 106-119.) The Nebraska Supreme Court wrote, in relevant part:

> Dunkin contends that his trial counsel was ineffective for failing to file a direct appeal in response to his request that he do so. Under certain circumstances, the nature of counsel's deficient conduct in the context of the prior proceedings can lead to a presumption of prejudice, negating the defendant's need to offer evidence of actual prejudice in a postconviction case. After a trial, conviction, and sentencing, if counsel deficiently fails to file or perfect an appeal after being so directed by the criminal defendant, prejudice will be presumed and counsel will be deemed ineffective, thus entitling the defendant to postconviction relief.

> Assuming without deciding that the same principle would apply where conviction is the result of a guilty or no contest plea, critical question of fact is whether Dunkin directed his counsel to file a direct appeal on his behalf. After reviewing the evidence received at the postconviction hearing, the district court concluded that he did not. As noted above, Dunkin's mother, Chisholm, contacted counsel to discuss the possible success of an appeal, but the record does not indicate that she specifically requested counsel to pursue an appeal. And there is no evidence that Dunkin attempted to contact counsel by letter or telephone to make such a request himself. It is uncontested that Dunkin and counsel had no contact following the sentencing proceedings. Based

upon our review of the record, we conclude that these findings are not clearly erroneous.

*Dunkin*, 807 N.W.2d at 759.

The Nebraska state courts' findings of fact and conclusions of law under *Strickland* are entitled to deference under the statutory standard of review that applies to factual and legal conclusions reached by the state courts. Moreover, the state courts' determination that trial counsel was not ineffective is consistent with the Supreme Court's articulation of *Strickland* in *Roe v. Flores-Ortega*, 528 U.S. 470 (2000).

In *Flores-Ortega* the Supreme Court held that the ineffective assistance of counsel test in *Strickland* applies to claims that counsel was constitutionally ineffective for failing to file a notice of appeal. *See Flores-Ortega*, 528 U.S. at 477. The court applied the two-part *Strickland* test to the issue of failure to file a notice of appeal. First, with respect to the reasonableness of counsel's representation, the Court held:

> [C]ounsel has a constitutionally-imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing.

*Id.* at 480. "In making this determination, courts must take into account all the information counsel knew or should have known." *Id.*

Second, with respect to prejudice, the Court held that to show prejudice, a defendant "must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely

appealed." *Id.* at 484. The "would have appealed" standard considers all of the circumstances, including whether there were nonfrivolous issues to appeal. *Id.* at 485.

In sum, the Supreme Court concluded that "when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken, the defendant has made out a successful ineffective assistance of counsel claim entitling him to an appeal." *Id.* at 484. Applying the *Flores-Ortega* holdings to Dunkin's case, the court concludes that Dunkin has not made out a successful ineffective assistance of counsel claim entitling him to an appeal.

Here, the state courts found that Dunkin did not instruct trial counsel to file a notice of appeal. The courts' findings were not based on an unreasonable determination of the facts in light of the evidence. In addition, it is undisputed that Dunkin and trial counsel had no contact following the sentencing hearing. Thus, the court must consider whether trial counsel's failure to confer with Dunkin about the possibility of a direct appeal was unreasonable. There are two parts to the reasonableness inquiry, and counsel had a duty to consult with Dunkin if either part applies. First, counsel has a duty "when there is reason to think . . . that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal)." *Flores-Ortega*, 528 U.S. at 480. Second, counsel has a duty "when there is reason to think . . . that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Id.*

The court finds that trial counsel's failure to confer with Dunkin about filing a notice of appeal was not unreasonable. As to the question of whether Dunkin reasonably demonstrated an interest in appealing, the Nebraska Supreme Court found that, while Dunkin's mother contacted trial counsel to discuss the possible success of an appeal, she did not ask trial counsel to file an appeal. The court also found there was no evidence that Dunkin attempted to contact counsel by letter or telephone

21

to make such a request himself. *Dunkin*, 807 N.W.2d at 759.  In other words, Dunkin did not reasonably demonstrate to trial counsel that he was interested in appealing.

As to the question of whether a rational defendant would want to appeal, the Supreme Court indicated that pleading guilty, and the circumstances of the plea, could be considered in the inquiry:

> Although not determinative, a highly relevant factor in this inquiry is whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings. Even in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights.

*Flores-Ortega*, 528 at 480.

Here, Dunkin pleaded guilty and received the sentence bargained for in the plea agreement (i.e., a sentence for second-degree murder instead of a sentence for first-degree murder).  The sentence was within the range that Dunkin indicated he understood applied.  That is, the court advised him that second-degree murder was a Class I-B felony that carried a possible penalty of 20 years' to life imprisonment, Dunkin affirmed that he understood the nature of the charges, and Dunkin ultimately received a sentence within the range of possible penalties.  (Filing No. 8-1 at CM/ECF p. 74.)

In addition, the court takes into account the information trial counsel knew following Dunkin's sentencing.  He knew that, while the plea deal allowed Dunkin to plead guilty to the charge of second degree murder, the evidence suggested that Dunkin was guilty of an intentional murder.  A forensic pathologist, hired by the

22

defense, reviewed the crime scene reports, photographs, and autopsy findings and concluded that Dunkin's version of the incident were not plausible and that the victim appeared to have been "executed." (Filing No. 8-5 at CM/ECF p. 114.) A rational defendant in this situation would not want to appeal his conviction only to face the original first degree murder charge. Moreover, Dunkin has not identified any nonfrivolous grounds for appeal and, after careful review of the record, the court finds there are none. As the facts before the court are the same facts that were before Dunkin's counsel, Dunkin's counsel would have had no reason to believe that a rational defendant in Dunkin's situation would have wanted to appeal. For the foregoing reasons, Dunkin's trial counsel was not ineffective for failing to consult with him about his right to appeal, and Dunkin has not shown that he would have taken an appeal had counsel actually conferred with him. Accordingly, a grant of a writ of habeas corpus is not warranted on this issue.

## III.  CERTIFICATE OF APPEALABILITY

A petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A certificate of appealability cannot be granted unless the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. Daniel*, 529 U.S. 473, 484 (2000).

In this case, Petitioner has failed to make a substantial showing of the denial of a constitutional right. The court is not persuaded that the issues raised in the Petition and Amended Petition are debatable among reasonable jurists, that a court could resolve the issues differently, or that the issues deserve further proceedings. Accordingly, the court will not issue a certificate of appealability in this case.

23

IT IS THEREFORE ORDERED that:

1.     This matter is dismissed with prejudice, and a separate judgment will be entered in accordance with this Memorandum and Order.

2.     The court will not issue a certificate of appealability in this matter.

DATED this 21st day of May, 2013.

BY THE COURT:

s/ Joseph F. Bataillon
United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.